No. 2013-1544

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

ALZHEIMER'S INSTITUTE OF AMERICA, INC.

*Plaintiff-Appellant,*

v.

AVID RADIOPHARMACEUTICALS,

*Defendant-Appellee,*

and

THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA,

*Defendant-Appellee,*

and

UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES,

*Defendant-Appellee.*

**Appeal from the United States District Court for the Eastern District of Pennsylvania in
Case No. 10-CV-6908, Judge Timothy J. Savage**

**BRIEF OF APPELLEES AVID RADIOPHARMACEUTICALS, THE TRUSTEES OF THE
UNIVERSITY OF PENNSYLVANIA, AND UNIVERSITY OF SOUTH FLORIDA BOARD OF
TRUSTEES**

Joseph Lucci
Jordan J. Oliver
BAKER & HOSTETLER, LLP
Cira Center, 12th Floor
2929 Arch Street
Philadelphia, Pennsylvania 19104
(215) 568-3100
*Attorneys for Defendant-Appellee
The Trustees of the University
of Pennsylvania*

Jerry Stouck
GREENBERG TRAURIG LLP
2101 L Street, NW, Suite 1000
Washington, D.C. 20037
(202) 331-3100
*Attorneys for Defendant-Appellee
University of South Florida
Board of Trustees*

January 24, 2014

Charles E. Lipsey
L. Scott Burwell
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
11955 Freedom Drive
Reston, Virginia 20190
(571) 203-2700

Robert D. Bajefsky
Laura P. Masurovsky
Danielle A. Duszczyszyn
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue, N.W.
Washington, D.C. 20001
(202) 408-4000

Steven P. Caltrider
Manisha A. Desai
Eli Lilly and Company
Lilly Corporate Center
Indianapolis, Indiana 46285
(317) 276-2000
*Attorneys for Defendant-Appellee
Avid Radiopharmaceuticals*

# CERTIFICATE OF INTEREST OF
# AVID RADIOPHARMACEUTICALS

Counsel for Defendant-Appellee Avid Radiopharmaceuticals certifies the following:

1.    The full name of every party or amicus represented by me is:

    Avid Radiopharmaceuticals

2.    The name of the real party in interest represented by me is:

    None

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

    Eli Lilly and Company

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

    Charles E. Lipsey
    L. Scott Burwell
    FINNEGAN, HENDERSON, FARABOW,
     GARRETT & DUNNER, LLP
    11955 Freedom Drive
    Reston, Virginia 20190
    (571) 203-2700

    Robert D. Bajefsky
    Laura P. Masurovsky
    Mark J. Feldstein
    Danielle A. Duszczyszyn
    FINNEGAN, HENDERSON, FARABOW,
     GARRETT & DUNNER, LLP
    901 New York Avenue, N.W.
    Washington, D.C.  20001
    (202) 408-4000

Nathaniel S. Edwards (no longer with firm)
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
Two Seaport Lane, 6th Floor
Boston, Massachusetts 02210
(617) 646-1600

Stephen G. Harvey (no longer with firm)
Charles S. Marion
PEPPER HAMILTON L.L.P.
3000 Two Logan Square
Philadelphia, Pennsylvania 19103
(215) 981-4000

Steven P. Caltrider
Manisha A. Desai
ELI LILLY AND COMPANY
Lilly Corporate Center
Indianapolis, Indiana 46285
(317) 276-2000

# CERTIFICATE OF INTEREST OF
## THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA

Counsel for Defendant-Appellee The Trustees of the University of Pennsylvania certifies the following:

1.      The full name of every party or amicus represented by me is:

      The Trustees of the University of Pennsylvania

2.      The name of the real party in interest represented by me is:

      None

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

      None

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

      Joseph Lucci
      Jordan J. Oliver
      J. Vaughn Spencer
      BAKER & HOSTETLER LLP
      Cira Centre, 12th Floor
      2929 Arch Street
      Philadelphia, PA  19104-2891
      (215) 568-3100

      WOODCOCK WASHBURN LLP
      Cira Centre, 12th Floor
      2929 Arch Street
      Philadelphia, PA  19104-2891
      (215) 568-3100

## CERTIFICATE OF INTEREST OF
## UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES

Counsel for Intervenor-Appellee University of South Florida Board of Trustees certifies the following:

1.     The full name of every party or amicus represented by me is:

    University of South Florida Board of Trustees

2.     The name of the real party in interest represented by me is:

    University of South Florida Board of Trustees

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

    None

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

    Jerry Stouck
    Greenberg Traurig LLP
    2101 L Street NW, Suite 1000
    Washington, DC 20037

    David Scott Taylor
    Steven B. Kelber (no longer with firm)
    Kyle G. Hepner
    Berenato & White LLC
    6550 Rock Spring Drive, Suite 240
    Bethesda, MD 20817

Bonnie Hoffman
Dylan J. Steinberg
Robert L. Ebby
Ronald P. Schiller
Hangley Aronchick Segal & Pudlin
One Logan Square
27th Floor
Philadelphia, PA 19103

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................ viii

STATEMENT OF RELATED CASES ............................................... xii

STATEMENT REGARDING USF'S JOINDER ................................ xiii

TABLE OF ABBREVIATIONS ........................................................ xiv

I.    PRELIMINARY STATEMENT .................................................1

II.   STATEMENT OF THE ISSUES ...............................................4

III.  STATEMENT OF THE CASE ...................................................5

      A.   Background of Hardy and Mullan .................................5

      B.   The Discovery of the London Mutation .........................7

      C.   The Athena Agreement ................................................9

      D.   Dissatisfaction with the Athena Agreement ................10

      E.   The Move to USF ......................................................13

      F.   The Discovery of the Swedish Mutation .....................15

      G.   The Scheme to Deprive Imperial and USF of Rights in the
           Swedish Mutation .....................................................17

      H.   AIA's Assertion of the Swedish Mutation Patents ........22

IV.   SUMMARY OF THE ARGUMENT .........................................22

V.    ARGUMENT ..........................................................................25

      A.   Standard of Review ...................................................25

      B.   Substantial Evidence Supports the Jury Verdict that Hardy
           Was a Joint Inventor .................................................27

           1.   Hardy Made a Substantial Contribution to Conception ............28

2. *Amgen* Does Not Set the Standard for Determining Co-inventorship..........................................................31

3. Hardy's Testimony Was Well Corroborated ............................34

    a. The Corroborating Evidence Was Legally Sufficient.........................................................34

    b. Contemporaneous Documents and Testimony of Others Provide Substantial Evidence Corroborating Hardy's Testimony ..................................36

4. The Jury Was Entitled to Reject AIA's Contentions As Not Credible .......................................................38

C. The Trial Court's Jury Instructions Do Not Warrant a New Trial on the Issue of Inventorship ........................................43

D. Mullan's Rights in the Patents in Suit Were Owned by USF ............45

1. The Florida Regulation Was Binding by Virtue of Mullan's Employment ...............................................46

2. The Florida Regulation Is Not Subject to 35 U.S.C. § 261 ..........................................................48

3. The Florida Regulation Is Not Preempted .................................50

4. AIA's Lack of Legal Title Deprives It of Standing..................53

E. The Trial Court's Jury Instructions on the Issue of Waiver Were Correct and Do Not Warrant a New Trial .................................57

F. The Trial Court's Evidentiary Rulings Were Correct and Do Not Warrant a New Trial....................................................60

VI. CONCLUSION...............................................................62

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abraxis Bioscience, Inc. v. Navinta LLC*,
   625 F.3d 1359 (Fed. Cir. 2010) ..........................................................61

*Akazawa v. Link New Tech. Int'l, Inc.*,
   520 F.3d 1354 (Fed. Cir. 2008) ...............................................49, 51, 52

*Amgen Inc. v. Chugai Pharm. Co.*,
   927 F.2d 1200 (Fed. Cir. 1991) ...............................................31, 32, 33

*Arachnid, Inc. v. Merit Indus., Inc.*,
   939 F.2d 1574 (Fed. Cir. 1991) ..........................................................57

*Bard Peripheral Vascular, Inc. v. W.L. Gore Assocs., Inc.*,
   670 F.3d 1171 (Fed. Cir. 2012) ..........................................................26

*Bd. of Trustees of Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.*,
   583 F.3d 832 (Fed. Cir. 2009) ......................................................54, 56

*Bd. of Trustees of Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.*,
   131 S. Ct. 2188 (2011) ......................................................................50

*Berges v. Gottstein*,
   618 F.2d 771 (CCPA 1980) ...............................................................35

*ClearValue, Inc. v. Pearl River Polymers, Inc.*,
   668 F.3d 1340 (Fed. Cir. 2012) ..........................................................25

*Cooper Distrib. Co. v. Amana Refrig., Inc.*,
   63 F.3d 262 (3d Cir. 1995) ................................................................26

*Cooper v. Goldfarb*,
   154 F.3d 1321 (Fed. Cir. 1998) ....................................................35, 38

*Dorr-Oliver, Inc. v. United States*,
   432 F.2d 447 (Ct. Cl. 1970) ...............................................................55

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
485 U.S. 568 (1988) ........................................................................53

*Enovsys LLC v. Nextel Commc'ns, Inc.*,
614 F.3d 1333 (Fed. Cir. 2010) ...................................49, 50, 51, 52

*Ethicon, Inc. v. U.S. Surgical Co.*,
135 F.3d 1456 (Fed. Cir. 1998) .............................................34, 35

*Falana v. Kent State Univ.*,
669 F.3d 1349 (Fed. Cir. 2012) ......................................................32

*FilmTec Corp. v. Allied-Signal Inc.*,
939 F.2d 1568 (Fed. Cir. 1991) ...............................................54, 56

*FilmTec Corp. v. Hydranautics*,
982 F.2d 1546 (Fed. Cir. 1992) ...................................45, 47, 54, 56

*Fina Oil & Chem. Co. v. Ewen*,
123 F.3d 1466 (Fed. Cir. 1997) ...............................................32, 34

*Goodman v. Pa. Turnpike Comm'n*,
293 F.3d 655 (3d Cir. 2002) ..........................................................27

*Isr. Bio-Engineering Project v. Amgen Inc.*,
401 F.3d 1299 (Fed. Cir. 2005) ......................................................49

*Jim Arnold Corp. v. Hydrotech Sys., Inc.*,
109 F.3d 1567 (Fed. Cir. 1997) ......................................................51

*Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co.*,
973 F.2d 911 (Fed. Cir. 1992) ........................................................28

*Knorr v. Pearson*,
671 F.2d 1368 (CCPA 1982) ..........................................................38

*Krausz Indus. Ltd. v. Romac Indus., Inc.*,
No. C10–1204RSL, 2011 WL 3563419 (W.D. Wash. Aug. 15, 2011)..............51

*Lightning Lube, Inc. v. Witco Corp.*,
4 F.3d 1153 (3d Cir. 1993) ............................................................26

*Link v. Mercedes-Benz of N. Am., Inc.*,
    788 F.2d 918 (3d Cir. 1986) ...............................................................27

*Marra v. Phila. Hous. Auth.*,
    497 F.3d 286 (3d Cir. 2007) .........................................................25, 43

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
    579 F.3d 1363 (Fed. Cir. 2009) ..........................................................25

*Mercantile Nat'l Bank of Chicago v. Howmet Corp.*,
    524 F.2d 1031 (7th Cir. 1975) ............................................................55

*MHL Tek, LLC v. Nissan Motor Co.*,
    655 F.3d 1266 (Fed. Cir. 2011) ..........................................................54

*Monsanto Co. v. Kamp*,
    269 F. Supp. 818 (D.D.C. 1967)..........................................................28

*Murray v. United of Omaha Life Ins. Co.*,
    145 F.3d 143 (3d Cir. 1998) ...............................................................27

*Price v. Symsek*,
    988 F.2d 1187 (Fed. Cir. 1993) ..........................................................36

*Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*,
    264 F.3d 1344 (Fed. Cir. 2001) .....................................................34, 35

*Sanofi-Aventis v. Pfizer, Inc.*
    733 F.3d 1364 (Fed. Cir. 2013) ..........................................................32

*Singh v. Brake*,
    317 F.3d 1334 (Fed. Cir. 2003) ..........................................................34

*Sky Techs. LLC v. SAP AG*,
    576 F.3d 1374 (Fed. Cir. 2009) ...............................................49, 51, 52

*Speedplay, Inc. v. Bebop, Inc.*,
    211 F.3d 1245 (Fed. Cir. 2000) .....................................................55, 56

*Vanderbilt Univ. v. ICOS Corp.*,
    601 F.3d 1297 (Fed. Cir. 2010) .....................................................32, 44

*Wilder v. GL Bus Lines*,
No. 99 Civ. 9992, 2000 WL 959751 (S.D.N.Y. July 11, 2000) (2d Cir. 2001) ...................................................................................47

*Winans v. Weber*,
979 So. 2d 269 (Fla. Dist. Ct. App. 2007) .........................................58

STATUTES

35 U.S.C. § 116..............................................................................28, 33

35 U.S.C. § 261..........................................................................23, 48, 49

Fla. Admin. Code § 6C4-10.001 .......................................................46

Fla. Admin. Code § 6C4-10.012 ..................................................passim

Fla. Stat. § 240.229 (1991)...............................................................57

UK Patents Act 1977, § 39(1)..............................................................11

OTHER AUTHORITIES

49 C.F.R. § 382.601(d) .......................................................................47

## STATEMENT OF RELATED CASES

An Emergency Petition for Writ of Mandamus, styled *In re University of South Florida Board of Trustees*, was filed on November 29, 2011 (Misc. Docket No. 111).  On January 12, 2012, Judges Newman, Linn, and Reyna denied the petition in an opinion reported at 455 Fed. Appx. 988.

The following cases will be directly affected by this Court's decision in the pending appeal:

*Alzheimer's Institute of America, Inc. v. Elan Corp. PLC, et al.*, No. 3:10-cv-00482-EDL (N.D. Cal.).

*Alzheimer's Institute of America, Inc. v. Comentis, Inc., et al.*, No. 5:09-cv-01366-F (W.D. Okla.).

## <u>STATEMENT REGARDING USF'S JOINDER</u>

The University of South Florida Board of Trustees, whose intervention in the case before the trial court was limited to the issue of waiver (A924), joins the portions of this brief pertaining to that issue.

## <u>TABLE OF ABBREVIATIONS</u>

| | |
|---|---|
| AD: | Alzheimer's disease |
| AIA: | Alzheimer's Institute of America, Inc. |
| AIA___: | References to pages of AIA's principal brief |
| APP: | Amyloid precursor protein |
| Athena: | Athena Neurosciences, Inc. |
| Avid: | Avid Radiopharmaceuticals |
| HCHWA-D: | Hereditary cerebral hemorrhage with amyloidosis-Dutch type |
| Imperial: | Imperial College of Science, Technology and Medicine |
| Penn: | The Trustees of the University of Pennsylvania |
| St. Mary's: | St. Mary's Hospital Medical School |
| USF: | University of South Florida |
| A____:yy | For a citation to a transcript, "A____" refers to the appendix page of the transcript; "yy" refers to the line number |
| ***Bold-Italicized text*** | All emphasis added unless otherwise stated |

## I.     PRELIMINARY STATEMENT

Based on inventions originally discovered at the University of Pennsylvania (Penn), Avid Radiopharmaceuticals (Avid) developed and now sells a brain imaging technology that detects β-amyloid deposits in the brains of patients being screened for Alzheimer's Disease (AD).  AIA, a company that sells no product and that is controlled by Ronald Sexton, sued Avid and Penn for patent infringement arising from the alleged use in their AD research of the human DNA sequence—now known as the "Swedish Mutation"—upon which the asserted patents are based.  AIA filed similar suits against a number of other companies engaged in AD research, some of whom capitulated, paying millions of dollars to AIA.

Avid and Penn resisted, exploring through discovery how patent rights in an interdisciplinary discovery made by a group of researchers who were at all relevant times employed by two academic institutions—Imperial College (Imperial) and the University of South Florida (USF)—came to be controlled by Sexton, a Kansas City businessman having no prior experience in pharmaceutical development.  That inquiry, and the resulting trial evidence, revealed a sordid tale of the corruption of research scientists by commercial interests, leading to the jury findings underlying the trial court's judgment that AIA lacked standing to assert these patent rights.

1

The trouble began with a scientific tour de force—the discovery by a group of Imperial scientists, led by Dr. John Hardy and including Dr. Alison Goate and then Ph.D. student Dr. Michael Mullan, of the first AD-causing genetic defect, later dubbed the "London Mutation."  Imperial gave options to that and any new discoveries made by Hardy's group to a pharmaceutical company (Athena) under a sponsored research agreement.  Viewing that deal as a "terrible agreement," and spurred on by Sexton's perception of a business opportunity for himself, the Imperial scientists sought to recapture rights to their past and future AD research.  One attempt to do so, through misrepresentations about the origins of their past work on the London Mutation, failed when Imperial determined that it owned the discovery by virtue of its employment of the inventors.  Sexton and the Imperial scientists then resolved not to "give anything else away" to Imperial.

Accordingly, when Hardy recognized that the data was "screaming" that there was a mutation in the DNA of Swedish families he was studying, he chose not to identify the actual sequence of the mutation at Imperial.  Instead, he sent the DNA to Mullan, who had moved to USF, so it could be sequenced there.  To obscure the involvement of the Imperial researchers, the resulting patent application on the Swedish Mutation was filed in the name of Mullan alone, excluding laboratory leader and co-inventor Hardy, and false letters were sent to Imperial denying Hardy's involvement.  Again abetted by Sexton, the group misled

2

USF into believing that work they had done related to prior research on the London Mutation, thereby securing a signature on a letter that AIA asserts waived USF's ownership of the newly-discovered Swedish Mutation. The patent application on the Swedish Mutation then was immediately filed and assigned to Sexton's company, AIA.

At trial, three of the Imperial scientists, Hardy, Goate, and Hardy's former laboratory technician Henry Houlden, repudiated the scheme to deprive these academic institutions of their rights to this discovery, acknowledging the falsity of the letters sent in furtherance of the scheme. The original laboratory records showing the extent of the research performed at Imperial under Hardy's supervision were received in evidence and explained, as were the circumstances surrounding the non-disclosure of the Swedish Mutation when securing the alleged waiver of USF's rights.

The jury found that at least Hardy was a co-inventor of the patented subject matter. Thus, AIA's purported assignment from Mullan alone did not convey to AIA all substantial rights in the underlying invention and the resulting asserted patents. The jury further found that USF had not knowingly and intentionally waived its rights in the Swedish Mutation. Thus, the rights purportedly transferred by Mullan to AIA were in fact owned by USF by operation of Florida law. The trial court properly entered judgment dismissing AIA's infringement claims for

3

lack of standing, and courts where other AIA actions were pending dismissed the infringement claims in those cases as well.

AIA's appeal leaves Sexton and Mullan alone clinging to the past misrepresentations now repudiated by the other scientists and by original laboratory records. But substantial evidence, indeed overwhelming evidence, supported the jury's findings. Those findings quintessentially reflect the jury's assessment of the credibility of the witnesses that appeared before it and should not be disturbed on appeal.

## II.  STATEMENT OF THE ISSUES

The issues presented in this appeal are:

1.      Did substantial evidence support the jury's verdict that Hardy was a joint inventor of the Swedish Mutation where the trial evidence demonstrated that (1) Hardy made a substantial contribution to the conception of that invention, (2) Hardy collaborated with Mullan in the research that resulted in the invention, and (3) Hardy's testimony was corroborated by contemporaneous documents and testimony of others?

2.      Did the trial court properly hold that Fla. Admin. Code § 6C4-10.012 was applicable to Mullan, whereby rights in inventions made while Mullan was employed by USF were owned by USF?

4

3.     Did the trial court properly instruct the jury on the issues of inventorship and waiver, and if not, was the trial court's failure to give AIA's proposed instructions harmless?

4.     Did the trial court properly exclude evidence that was hearsay and/or had no relevance to whether Dr. George Newkome, the sole USF administrator whose conduct was at issue, made a knowing and intentional waiver of USF's rights in the Swedish Mutation?

## III.    STATEMENT OF THE CASE

### A.    Background of Hardy and Mullan

Hardy was at all times the leader of and intellectual driving force behind his group's search for mutations that caused AD.  He began studying AD in 1979.  (A3171:18-A3172:9.)  In 1985, he moved to St. Mary's, now Imperial, where he started an AD laboratory and research program.  (A3173:25-A3175:18.)  Within a year, his research focused almost entirely on the genetics of that disease.  (A3175:19-A3176:2.)

The study of the genetics of AD—indeed, of any disease—is a large and complicated undertaking involving many scientists from a number of different disciplines.  (A3201:20-A3204:22; A6061.)  Consequently, Hardy's laboratory employed scientists from several disciplines.  (A3785:24-A3786:19; A3668:4-A3669:10.)  Among these scientists, all of whom Hardy hired, were

5

Goate, Marie-Christine Chartier-Harlin, Houlden, Fiona Crawford, and Mullan. (A3184:24-A3185:1; A3778:14-16; A3783:18-A3784:1; A3786:7-19; A3668:22-24; A3855:8-12.) Hardy served as the principal investigator and had overall responsibility for research conducted in his laboratory. (A3202:13-A3203:1; A3783:21-23; A3790:18-22; A6061; A3668:4-8; A3857:11-17; A2715:6-8.)

Mullan joined Hardy's laboratory as a research fellow and a Ph.D. student under Hardy. (A3188:9-A3189:3; A2708:8-22; A6118.) At the time, Mullan was a medical doctor trained in psychiatry and had some experience in collecting information from AD families. (A3786:17-19; A6016.) He joined Hardy's laboratory to obtain training in molecular genetic techniques. (*Id*.) Mullan did not have expertise in "linkage analysis" when he joined Hardy's laboratory.[1] (A3188:9-22; A3199:21-A3201:11.) He learned how to conduct this analysis from other scientists in Hardy's laboratory and through two courses to which Hardy sent him. (A2404:21-A2405:7; A3200:19-A3201:7.)

Mullan participated in the ongoing collaborative research in Hardy's laboratory. (A3793:18-19; A3690:15-A3691:6.) That research resulted in

---

[1] "Linkage analysis" is a technique used to identify the location of disease-causing mutations on a chromosome. (A3206:1-A3209:6.)

numerous publications listing Hardy and other scientists (including Mullan) as coauthors.  (A146-50; A222-26; A227-28; A229-30; A4431-33; A6115-17.)

### B.  The Discovery of the London Mutation

In 1990, Hardy, in collaboration with other scientists in his laboratory, discovered the first genetic mutation associated with AD, a change in codon 717 of the amyloid precursor protein ("APP") gene.  (A3205:4-A3206:4; A3667:11-24; A6220-77; A6115-17.)  The mutation occurred in a portion of that gene encoding a protein called β-amyloid, which deposits in the brain of AD patients.  This mutation became known as the "London Mutation."  (A3205:11-15.)

Hardy made two decisions that led to the discovery of the mutation: (1) to search for mutations in the APP gene, and (2) to focus on individual early-onset families.  (A3211:19-22; A3207:19-22; A3206:19-23.)  He based the first decision on his knowledge of the discovery by a group of scientists, including Hardy, of the cause of a disease called "HCHWA-D."  (A3208:5-17; A3787:14-A3788:6; A219-21.)  That disease, like AD, was characterized by the presence of β-amyloid in the brain.  (A3208:5-17; A3214:14-19; A3787:14-A3788:6.)  The group had discovered that affected individuals had a mutation in exon 17 of the APP gene, which, along with exon 16, encoded β-amyloid.  Hardy reasoned that if a mutation in APP could cause the deposition of β-amyloid in HCHWA-D, then it was

possible that a mutation in APP could also cause the deposition of that protein in AD.  (A3214:9-21.)

Hardy based the second decision on a collaborative study involving all of the major research groups working on AD genetics, including his laboratory.  (A3788:18-A3789:11.)  That study concluded that AD was "heterogeneous," meaning that not all cases of AD were caused by a mutation in the same gene.  (A3207:13-19; A3789:6-7.)

Based on these two studies, Hardy, in collaboration with other scientists in his laboratory, decided to search for APP mutations by analyzing one family at a time.  (A3208:18-A3209:13; A3789:1-11.)  Genetic analysis of a particular family, designated "family 23," suggested a mutation on chromosome 21, the location of the APP gene.  (A3208:22-25; A3211:25-A3214:25.)  Consequently, a mutation in the APP gene could not be excluded.  (A3208:22-25.)  Accordingly, Hardy decided to analyze exons 16 and 17 of the APP gene, leading to the discovery of the London Mutation.  (A3216:1-3218:24; A3208:25-A3209:2; A6119; A6115-117.)

Publication of the discovery of the London Mutation was met with world-wide acclaim.  (A3218:25-A3219:25; A3789:16-A3790:13; A6292-98; A6278.)  A patent application was filed, naming as co-inventors the five scientists from different disciplines who had collaborated to identify the London Mutation.  (A3205:4-A3207:3.)

8

## C.     The Athena Agreement

After the discovery of the London Mutation, Imperial and Athena entered

into a sponsored research agreement under which Athena funded research in

Hardy's laboratory.  (A3306:14-A3308:17; A3796:6-A3797:24; A244-61.)  It

granted Athena an option to the London Mutation patent and to all subsequent APP

mutations discovered in Hardy's laboratory.  (A3797:25-A3798:8; A251-52.)  The

agreement specified that the project would be "conducted . . . under the direction

of" Hardy and Goate, the "Principal Investigators."  (A247; A3309:9-A3310:3;

A3796:19-A3797:6.)

During the negotiations leading to that agreement, Hardy drafted two letters

to Dr. Lieberburg, an Athena Vice President, explaining the procedures that would

be used in his laboratory to find additional mutations in the APP gene.  In the first

letter, Hardy stated that "we intend to screen all families we have for APP

mutations by sequencing and also by linkage (we need to check whether there are

families in which we can definitively rule out APP[)]."  (A234-37 (emphasis in

original); A3310:12-A3311:16.)  Hardy subsequently drafted a second letter

explaining the strategy in greater detail.  (A240-43; A3314:7-13;

A3316:11-A3321:2.)  That draft indicated that Hardy's laboratory would "assess

whether affected individuals share a single copy of the APP gene [using the so-

called "GT12" marker]."[2]  (A241; A3316:24-A3319:15.)  Hardy wrote, "If APP is

coinherited with the disease . . . the family enters the sequencing project," which

means that "exons 16 and 17 [will be] sequenced." (*Id.*)  Hardy explained that

"coinherited with the disease" meant that "affected family members have the same

copy of the amyloid gene." (A3319:21-A3320:10.)  The procedures described by

Hardy in these letters were ultimately used to discover the Swedish Mutation.

###    D.    Dissatisfaction with the Athena Agreement

The Hardy team soon concluded that Imperial had undervalued their

research in negotiating the Athena agreement (A3330:14-A3332:11), which Hardy

characterized as a "terrible agreement" (A3339:11-14).  Their discontent was

fomented by Sexton, a Kansas City businessman who had no experience in

scientific research but saw a business opportunity in the Hardy team's AD

research.  (A3332:14-A3333:24; A2094:15-A2095:15.)  Sexton suggested he could

offer them a better deal than they had with Athena and persuaded them to sign an

agreement giving Sexton exclusive rights in their scientific research.  (A262-63;

A2096:9-A2098:16; A3335:2-14; A3802:14-A3804:7.)

---

[2] GT12 is a genetic marker located close to the APP gene.  (A4431.)  It is a
repeating sequence of two nucleotides, the number of which varies within a
population.  (A3687:12-17; A4431.)  GT12 has 14 variants, each of which called
an "allele." (A2466:2-8.)  The marker, detectable by genetic analysis
(A3677:24-A3679:1), therefore allowed geneticists to trace the inheritance of APP
(A3319:10-15).

For Sexton to obtain these rights, it was necessary to undo the Athena agreement. To this end, Sexton suggested that Hardy, Goate, and Mullan challenge Imperial's claim to the London Mutation patent.[3] (A3340:3-A3341:8; A3800:10-A3802:6.) The group approached Imperial several times trying to achieve this goal. (A6121; A270; A6181-82; A6185.)

When these initial approaches failed, Mullan, Hardy, and Goate decided to send a letter to Imperial alleging that Mullan had conceived the London Mutation before he was employed by Imperial. (A3340:24-A3341:3; A3812:24-A3814:6.) If this were true, they reasoned, Imperial would not have rights to the mutation. (A3340:24-A3341:3.) In conjunction with sending the letter, Hardy, Mullan, and Goate arranged a meeting with Imperial, which they attended with Sexton and Alisdair Poore, a lawyer from Clyde & Co., who had been retained for the group by Sexton. (A3809:10-A3813:8; A6187; A6199.) Notwithstanding these efforts, Imperial rejected the claim that Mullan had made the invention prior to joining Imperial. (A6199.)

---

[3] Imperial owned that patent pursuant to the UK Patents Act 1977, which provides that inventions made by employees in the course of their normal duties belong to the employer. (*See* A6198; UK Patents Act 1977, § 39(1).)

Hardy and Goate testified that these allegations regarding Mullan's role are false.[4] (A3813:15-A3815:10; A3355:21-A3360:24.) At the time of the letter to Imperial, Goate was a "very inexperienced and junior scientist" (A3829:3-5), at the beginning of her career. Today, Goate is a highly respected expert in the genetics of neurological disease, especially AD. (A3777:21-A3780:13.) Goate participated in this "scheme to cheat Imperial" (A3831:18-22), because she felt pressure from Hardy, Mullan, and Sexton. (A3815:6-14). Notwithstanding potential professional and personal embarrassment, Goate admitted in open court that she was "not proud of what she did," that she did make false statements, and that she had come to court to testify so that "the truth can come out about what happened 20 years ago." (A3851:1-A3852:1.)

Becoming increasingly frustrated with the inability to renegotiate the Athena agreement, the Imperial scientists decided that, to avoid Athena's option to new APP mutations, they would not identify additional mutations at Hardy's Imperial laboratory. (A3341:6-14; A3800:25-A3802:1; A3868:16-A3869:11.) As Hardy

---

[4] In its brief, AIA continues to cling to the false statements in the letter to Imperial (AIA13) and cites "Mullan's research proposal" (AIA8) in an attempt to portray Mullan as *the* major contributor to the discovery of the London Mutation. Hardy and Goate testified that Hardy, not Mullan, wrote the portions of the research proposal upon which AIA relies, and Goate characterized the claim of Mullan's authorship as "revisionist history." (A3188:9-22; A3193:9-A3199:20; A3813:9-A3815:1.)

testified, "We decided to make sure we didn't give anything else away."

(A3341:13-14.)

### E.     The Move to USF

In late 1991, Hardy decided to move his laboratory from Imperial to USF, where he would be a full professor with an endowed chair.  (A3177:15-A3178:15; A3344:16-23; A2708:23-A2709:6; A6102-105.)  At Hardy's request, Mullan was hired by USF as a research associate in Hardy's laboratory.  (A2711:6-A2712:3; A3344:16-20; A6279.)

Hardy did not immediately close his laboratory at Imperial. (A3177:15-A3178:9.)  He continued to conduct research in that laboratory while the new laboratory was constructed at USF (*id.*), and he did not become a USF employee until May 1992 (A3400:8-15).  In contrast, Mullan began his employment with USF in December 1991 and moved to Florida to help set up Hardy's USF laboratory.  (A3344:24-A3345:2; A6095.)  In March 1992, Crawford joined Mullan in Florida.  (A1834:4-A1835:1.)

To obtain funding for his new laboratory, Hardy wrote and submitted a grant application.  (A3346:23-A3347:11; A273-322.)  The application identified Hardy as "Principal Investigator" (A278; A3347:18-20) and stated that he "will be responsible for the overall direction, planning, and executing of the project as he has for his group over the last five years in London (U.K.)" (A281).  Mullan's

13

position was identified as "Research Associate/Co-Investigator." (A278.) The application stated that the new laboratory would continue the search for new APP mutations. The application identified two "specific aims," the first of which was: "To identify other mutations within the β-amyloid precursor protein (APP) gene which lead to early onset Alzheimer's disease (AD) or other β-amyloid angiopathies." (A294; A3348:1-13.)

AIA characterizes that application as "Mullan's January 1992 grant application." (AIA60.) The application, however, identifies Hardy, not Mullan, as the principal investigator, and Hardy testified that he wrote it. (A278; A2715:6-12; A3347:1-20.) In fact, Mullan was not a principal investigator on any grants at the time. (A2715:15-18.)

AIA also suggests that the grant application signaled a shift from the strategy used at Imperial to screen for APP mutations. (AIA60.) To the contrary, the application outlines essentially the same strategy that Hardy proposed to Athena. This is shown by the last sentence of the paragraph from which AIA quoted. That sentence, which AIA did not quote, states: "After we have screened for known mutations by SSCA, we screen for the possibility of APP mutations by genetic analysis (see below)." (A295.) The next paragraph, which AIA also did not mention, discusses the use of GT12 followed by sequencing. (*Id.*) That is essentially the strategy set out in Hardy's second letter to Athena. (A241.)

14

### F. The Discovery of the Swedish Mutation

While visiting Sweden to give a Nobel lecture at the Karolinska Institute, Hardy met with some Swedish scientists and discussed a possible collaboration. (A3365:2-25.)  As a result of those discussions, Dr. Lars Lannfelt visited Hardy at Imperial in February of 1992.  (A3366:14-18; A3818:6-12; A3675:4-11.)  Lannfelt brought to Hardy's laboratory family trees (pedigrees) from several families and samples of DNA.  (A3367:2-A3368:24; A3675:4-19; A3818:6-12.)  Hardy decided to conduct genetic studies on two of the families, which were denominated "F139" and "F144."  (A3368:17-A3369:4; A3818:13-25.)  To this end, he asked Houlden, then a technician in his laboratory, to conduct a "GT12 analysis" on the DNA from the families.  (A3370:10-18; A3819:2-4; A3675:4-13.)

Houlden spent several weeks conducting this analysis (A6123-79) and provided the results to Hardy in London (A3371:2-A3372:8; A3681:9-11).  Hardy interpreted Houlden's data and concluded that F144 was "screaming amyloid [mutation] . . . because all the affected individuals share the same copy of the amyloid gene."  (A3372:9-18.)  He also concluded that one "[d]efinitely could not exclude amyloid [mutation] in [F]139."  (A3376:20-A3377:6.)  Hardy explained in detail how he analyzed Houlden's data and why he reached those conclusions. (A3372:9-A3381:15.)

15

Houlden corroborated Hardy's testimony, stating that Hardy "thought family 144 was likely linked to APP, and [in family] 139 we could not determine whether it was either linked or not." (A3681:13-18; A3772:6-A3773:9.) And Dr. Karen Duff, another Imperial scientist, testified that Mullan told her that Hardy and Mullan knew that the Swedish families had a genetic mutation before it had been identified in Florida. (A3886:2-15.) Hardy's testimony was also corroborated by the testimony of Houlden and Goate that neither Hardy nor anyone else told them that Hardy believed the Swedish families did ***not*** have an APP mutation. (A3681:25-A3682:3; A3821:11-15.)

Having reviewed the GT12 data and reached the conclusion noted above, Hardy told Houlden to send the GT12 data and selected samples of DNA from the Swedish families to Mullan to have them sequenced in Florida. (A3381:17-A3382:2; A3399:3-10.) Specifically, Hardy testified that he instructed Houlden to send only DNA from a single affected individual in each family, and one unaffected individual. (A3399:3-10; A3548:11-A3549:12.) Houlden corroborated this testimony. (A3683:8-20.)

Hardy made this request with the aim that Imperial and Athena would not obtain rights to the new mutation. (A3381:21-23.) While Mullan was not capable of sequencing the DNA himself (A3382:20-22), Hardy knew that Crawford, who had experience in sequencing, would soon arrive in Florida (A3382:23-A3383:11).

16

Houlden, Goate, and Duff corroborated Hardy's testimony. (A3683:8-A3684:10; A3820:4-A3821:20; A3868:16-A3869:6; A3886:2-15.)

Consistent with the understanding of Hardy and Houlden, when Crawford arrived in Florida, she sequenced exons 16 and 17 of the APP gene. (A1838:16-19; A1846:19-21; A1847:9-10.) That sequencing revealed that the DNA of affected Swedish family members contained a double mutation in exon 16. (A1847:18-21; A3383:17-22.) Recognizing the potential value of the discovery, Hardy asked Duff, who was visiting Hardy and Mullan at USF, to draft a portion of the patent application on the Swedish Mutation in late April of 1992. (A3386:7-23; A3858:11-A3859:24.) Work also began on a scientific publication describing the discovery ultimately published in *Nature Genetics*. (A2652:12-A2653:16; A468-73.)

### G. The Scheme to Deprive Imperial and USF of Rights in the Swedish Mutation

After the sequencing of the Swedish DNA in Florida, the scientists, again abetted by Sexton and his Clyde & Co. lawyers, took steps to ensure that Imperial and USF would not obtain title to this invention. Mullan and Hardy agreed that Hardy's name would not be on any patent or publication concerning this discovery. (A3385:23-A3386:3; A3387:3-10.) They excluded Hardy because he was still an Imperial employee subject to the Athena agreement. (*Id.*) Thus, naming him as an

17

inventor on the patent or an author of the publication would raise questions about Imperial's and Athena's rights to the discovery. (*Id.*)

Hardy and Mullan also knew that, under USF's regulations governing ownership of inventions, USF would have rights to the mutation because Mullan was a USF employee. (A3400:16-A3402:1.) Therefore, Mullan, Hardy, and Sexton devised a plan to have USF waive its rights to the invention. (A3402:2-A3403:3.)

To this end, Sexton's lawyers sent USF a letter (A238-39) describing Hardy's and Mullan's prior work on the London Mutation and their dispute with Imperial. (A2979:11-13; A3404:7-15.) Without disclosing any information about work done at USF, much less the discovery of the Swedish Mutation on which patent drafting had already commenced, the letter asked that "all ownership of rights in any work carried out by them and inventions made by them (whether before or after the date of this letter) belong exclusively to Hardy and Mullan." (A238.)

Believing that the letter requested USF's confirmation that it would not assert rights in Hardy's and Mullan's London Mutation research, Dr. George Newkome, USF's Vice President for Research, signed the letter at a meeting with Sexton, Mullan, and Hardy on May 4, 1992. (A3405:6-16.) Newkome testified that he was aware of the London Mutation dispute between Hardy, Mullan, and

Imperial (A6184) and wanted to create a distinct line between research belonging to Imperial and research at USF (A2778:8-A2779:4: A2781:3-10: A2786:5-8).

Newkome testified that at no time before or during the meeting when he signed the letter was he informed of the Swedish Mutation or any work done in Florida on a new APP mutation. (A2793:5-17; A2794:6-10; *see also* A3405:6-12.) The letter he signed does not make such a disclosure. (A2786:17-A2787:2.) Nor did Hardy or Mullan send Newkome any such disclosure in a separate writing. (A2787:3-7.) Indeed, Newkome testified that he was told during the meeting that Mullan was unable to do any laboratory work because the laboratories had not been completed, and thus "there was really nothing new going on." (A2787:20-2788:3; *see also* A3404:21-25.) The USF regulations provided a specific procedure for disclosure of inventions (*see* Fla. Admin. Code § 6C4-10.012(3)(a) (A324-25)), but Mullan and Hardy did not follow that procedure in this case.

The day after Newkome signed the letter, Sexton incorporated AIA. (A2149:4-7; A6188-90.) The Swedish Mutation patent application was filed on June 4, 1992, naming Mullan as the sole inventor. Mullan assigned his entire purported right in the invention to AIA on July 15, 1992. (A2989:18-A2990:2; A266-69.)

In June 1992, Imperial learned that the Hardy team was about to announce a new discovery. (A3387:11-13.) Officials at Imperial questioned Houlden to determine whether Imperial and Athena had any interest in the invention. (A3702:18-A3703:15.) On June 15, 1992, Imperial memorialized its discussion in a letter to Houlden and sent a copy of the letter to Hardy, noting "You are supported by funds which come from Athena . . . . If any intellectual property of potential commercial value arises . . . then Athena has an option to an exclusive license . . . ." (A450; A3388:6-25.)

Hardy and Mullan discussed how best to respond. They agreed to minimize the description of the research that had actually been done at Imperial and to tell Imperial that Hardy was not involved in the work and that Houlden's role was trivial. (A3389:18-A3391:25.) Hardy prepared a draft response that attached pages of Houlden's raw data, which he faxed to Mullan in Florida. (A6203-10; A3395:9-23.) Concerned that Houlden's data would reveal the extent of the work performed at Imperial, Mullan told Hardy not to send data. (A3396:10-18.)

Hardy sent a revised response, which did not include Houlden's data. (A3396:19-22.) The response instead contained statements, demonstrated as false at trial, that: (1) Hardy did none of the work relating to the Swedish Mutation, (2) none of the work reported in the paper disclosing the Swedish Mutation was carried out at Imperial, (3) Houlden's work with the Swedish DNA was wasted

because of diagnostic and labeling errors, (4) Houlden's experiments showed that the amyloid gene did not co-inherit with the disease, (5) Mullan spotted errors and had the genetic analysis performed by the Swedish scientists, and (6) the paper contains the data generated by the Swedish scientists. (A453; A3390:22-A3393:18; A3029:13-19.)

Then 22-year-old Houlden, at the request of Mullan and Sexton, signed a letter drafted by Sexton's lawyers in which Houlden falsely disclaimed any role in the Swedish Mutation research and further falsely denied that research had been done at Imperial. (A465-66; A2218:2-A2219:18; A3695:2-A3702:13.) Like the response written by Hardy, this letter contained numerous admittedly and demonstrably false statements, such as that (1) the GT12 data he supplied on F139 and F144 excluded an APP mutation, (2) Mullan decided to have new GT12 data generated from rediagnosed and resampled individuals, and (3) new GT12 data was not generated at Imperial.[5] (A465-66; A3696:7-A3698:16.)

The letters written in efforts to improperly wrest ownership of the London and Swedish Mutations from Imperial were shown at trial, through the actual records of the scientific work and the corroborative testimony of Hardy, Goate,

---

[5] Houlden testified that he felt pressured by Mullan to sign the letter and believed that the letter was best for the new laboratory in Florida. (A3702:5-10.)

Houlden, and Duff, to have been false. Yet those letters remain the centerpiece of AIA's contention on appeal that Mullan was the sole inventor.

### H.    AIA's Assertion of the Swedish Mutation Patents

Sexton, through AIA, has asserted the Swedish Mutation patents in multiple lawsuits against a significant number of entities associated with AD research, including pharmaceutical companies large and small, non-profit research laboratories, reagent suppliers, and academic institutions. (A2087:5-11; A2087:25-A2089:10; A2089:20-25.) AIA does not conduct research or make any products. (A2086:6-11.) AIA's infringement claims have principally alleged use of the Swedish Mutation in AD research. (A2092:11-17; A6004-10.) Many of the defendants in these actions chose not to fight AIA and settled, some paying AIA millions of dollars. (A2173:22-A2174:22; A2176:6-A2178:19.) But Avid and Penn resisted. Through painstaking discovery, they uncovered the scheme to deprive Imperial and USF of their rights in the Swedish Mutation, leading inexorably to the conclusion that AIA lacked standing to pursue these suits, either because at least Hardy was a co-inventor or because AIA lacks title to the patents by virtue of Mullan's employment by USF.

## IV.    SUMMARY OF THE ARGUMENT

Substantial evidence supported the jury's verdict that Hardy was a co-inventor of the patents in suit. The trial evidence demonstrated that Hardy made a

substantial contribution to the conception of the Swedish Mutation, that Hardy recognized that a mutation in the Swedish DNA was likely, and that Hardy and Mullan collaborated in the research leading to the discovery of the Swedish Mutation. Moreover, Hardy's testimony was corroborated by the contemporaneous documents and testimony of other witnesses. AIA's contentions are not credible, as those contentions were repudiated by the evidence adduced at trial supporting the jury's finding that Hardy was a co-inventor.

There was no error in the trial court's jury instructions on the issue of inventorship. The instruction proposed by AIA would have endorsed the notion that each co-inventor must have an independent mental picture of the complete compound claimed, an interpretation that this Court has rejected as clearly wrong. And even if the trial court's refusal to adopt AIA's instruction was erroneous, such error was harmless.

The trial court properly held that Mullan's rights in the Swedish Mutation inventions were owned by USF, pursuant to Fla. Admin. Code § 6C4-10.012 ("the Florida Regulation"). The Florida Regulation was applicable to Mullan by virtue of his employment by USF, and Mullan's failure to sign an agreement recognizing the terms of the Florida Regulation does not affect its applicability. Moreover, the Florida Regulation is not an assignment, and thus is not subject to 35 U.S.C. § 261. Further, the Florida Regulation is not preempted. Ownership of inventions and

patents is governed by state law, not federal law, and ownership rights in an invention may pass, as it did here, by operation of state law.

The trial court did not err in instructing the jury on the issue of waiver. Contrary to AIA's assertion, it did not instruct the jury that a waiver could only be found where disclosure of the right alleged to be waived was made in the manner prescribed by the Florida Regulation. The court instructed the jury that there could be no waiver unless Newkome was in possession of all the material facts regarding the Swedish Mutation invention prior to signing that letter. This instruction was proper because (1) Newkome was the sole person having authority to waive USF's rights in inventions whose conduct was at issue, and (2) the only alleged act of waiver occurring before Mullan's purported assignment to AIA that could have bestowed standing on AIA was Newkome's signing of the May 4, 1992, letter. The trial court also did not err by making specific reference to the Swedish Mutation in its instruction, as that mutation was the sole focus of the asserted patents at issue in the case.

The trial court did not abuse its discretion by excluding various documents that were not written, authorized, or contemporaneously reviewed by Newkome, and thus could not have had any bearing on whether Newkome knowingly and intentionally waived USF's rights in the Swedish Mutation. Because those documents were properly excluded, no new trial is warranted.

24

## V.    ARGUMENT

### A.    Standard of Review

AIA's statement of the standard of review is incomplete and misleading. This Court reviews a denial of a motion for judgment as a matter of law (JMOL) under the law of the regional circuit, *ClearValue, Inc. v. Pearl River Polymers, Inc.*, 668 F.3d 1340, 1343 (Fed. Cir. 2012), here the Third Circuit.  That court's review of denial of a JMOL "is plenary," applying "the same standard as did the District Court."  *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007). Entry of JMOL "is a 'sparingly' invoked remedy, . . . 'granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.'"  *Id*. (citation omitted).  "If the evidence is such that a reasonable jury could find in favor of the non-movant, JMOL is inappropriate."  *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1369 (Fed. Cir. 2009) (applying Third Circuit law).  "In performing this narrow inquiry, [a court] must refrain from weighing the evidence, determining the credibility of witnesses, or substituting [its] own version of the facts for that of the jury." *Marra*, 497 F.3d at 300.  The Court must merely determine if the record contains "evidence upon which the jury could properly find a verdict for [defendants]."

25

*Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993) (citation omitted).

AIA, citing *Ethicon, Inc. v. U.S. Surgical Co*., 135 F.3d 1456 (Fed. Cir. 1998), contends that this Court should review the facts underlying an inventorship determination for clear error. (AIA44.) However, where the issue was tried before a jury, a court "must sustain the jury's conclusion unless the jury was not presented with substantial evidence to support any set of implicit findings sufficient under the law to arrive at its [inventorship] conclusion." *Bard Peripheral Vascular, Inc. v. W.L. Gore Assocs., Inc.*, 670 F.3d 1171, 1179 (Fed. Cir. 2012), *vacated as to issue of willfulness*, 682 F.3d 1003 (Fed. Cir. 2012).

In ruling on a motion for a new trial based on an allegedly erroneous jury instruction, the Court must determine "whether the charge, taken as a whole and viewed in light of the evidence, fairly and adequately submitted the issues in the case to the jury." *Cooper Distrib. Co. v. Amana Refrig., Inc.*, 63 F.3d 262, 275 (3d Cir. 1995) (citation omitted). The Court must "consider the totality of the instructions and not a particular sentence or paragraph in isolation." *Id.* (citation and internal quotations omitted). The Court may grant a new trial "only if the instruction was capable of confusing and thereby misleading the jury." *Id.* (citation and internal quotations omitted). When "the findings necessarily implicit in the verdict of the jury compel the conclusion that the jury would have reached

the same result had it been instructed according to the correct legal standard," the error was harmless, and the Court should not grant a new trial. *Murray v. United of Omaha Life Ins. Co.*, 145 F.3d 143, 156-57 (3d Cir. 1998).

The trial court also has great discretion in deciding a motion for a new trial based on alleged errors in the admission of evidence. *Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 921-22 (3d Cir. 1986). Even if a court concludes that an admissibility issue was wrongly decided, a new trial is unnecessary "if it is highly probable that the error did not affect the outcome of the case," i.e., "that the jury would have returned the same verdict regardless" of whether or not the evidence in question was admitted. *Goodman v. Pa. Turnpike Comm'n*, 293 F.3d 655, 667-68 (3d Cir. 2002) (citation and internal quotations omitted).

## B. Substantial Evidence Supports the Jury Verdict that Hardy Was a Joint Inventor

In deciding that Mullan was not the sole inventor and that Hardy was a joint inventor, the jury accepted the evidence supporting Avid's contentions on inventorship, rejected AIA's version of the events, and concluded that Hardy and Mullan collaborated in the research that led to the discovery of the Swedish Mutation. AIA has virtually ignored the record evidence supporting these implicit findings and contends that the district court should have granted JMOL because the record contains *some* evidence that supports its theory of the case. But that is not a basis for granting JMOL.

27

### 1. Hardy Made a Substantial Contribution to Conception

In *Kimberly-Clark Corp. v. Procter & Gamble Distributing Co.*, 973 F.2d 911, 916-17 (Fed. Cir. 1992), this Court quoted approvingly the classic definition of joint invention from *Monsanto Co. v. Kamp*, 269 F. Supp. 818, 824 (D.D.C. 1967):

> A joint invention is the product of *collaboration* of the inventive endeavors of two or more persons *working toward the same end* and producing an invention by their *aggregate* efforts. To constitute a joint invention, it is necessary that each of the inventors work on the same subject matter and make some contribution to the inventive thought and to the final result. Each needs to perform but a part of the task if an invention emerges from all of the steps taken together. It is not necessary that the entire inventive concept should occur to each of the joint inventors, or that the two should physically work on the project together. One may take a step at one time, the other an approach at different times. One may do more of the experimental work while the other makes suggestions from time to time. The fact that each of the inventors plays a different role and that the contribution of one may not be as great as that of another does not detract from the fact that the invention is joint if each makes some original contribution, though partial, to the final solution of the problem.

(Emphasis in original.) *See also* 35 U.S.C. § 116(a).

The record in this case contained substantial evidence that, applying this definition, Hardy is a joint inventor, as the district court found. (A8-12.) In fact,

AIA does not dispute the bulk of the evidence supporting Hardy's contribution to

the discovery of the Swedish Mutation. It does not challenge that Hardy:

1. received DNA and pedigrees for families 139 and 144 from Lannfelt
   (A2514:16-A2515:5; A3367:2-A3368:24; A3675:4-22; A3818:6-12);

2. decided to conduct genetic studies of the DNA from these families
   (A3368:25-A3369:15; A3675:4-11; A3818:10-25);

3. told Houlden to conduct GT12 analysis of the DNA from these
   families (A2514:16-A2515:5; A2724:1-14; A3370:10-18;
   A3674:25-A3676:9; A3818:13-A3819:4);

4. evaluated the results of the GT12 testing, which showed that every
   affected individual had the same GT12 allele 13 (A3372:9-18;
   A3376:23-A3377:6; A3681:9-18; A3772:12-19); and

5. instructed Houlden to send certain samples of the DNA, the GT12
   data, and the pedigrees to Mullan at USF (A3381:17-20; A3381:24-
   A3382:2; A3510:14-17; A3399:3-5; A3683:8-13; A3821:16-20;
   A2717:24-A2718:9).

Moreover, Mullan acknowledged that:

1. he received the DNA and GT12 data from Houlden
   (A2717:24-A2718:9);

2. all affected individuals had the same GT12 allele 13
   (A2734:19-A2735:3);

3. the GT12 data for family 144 "looked pretty good, by eye"
   (A2752:11-13);

4. Hardy would not have sent these materials to Mullan unless Hardy
   intended that Mullan would perform linkage calculations
   (A2718:20-23);

5. the only linkage calculation Mullan could perform with the GT12 marker data he had was to determine linkage to APP (the "amyloid gene") (A2718:20-2719:11);

6. he discussed with Hardy the GT12 results generated by Houlden (A2514:16-A2515:3); and

7. he communicated frequently about the analysis of the Swedish families because Hardy was his link to Houlden and Lannfelt (A2730:4-25).

Those undisputed facts demonstrate that Hardy collaborated with Mullan on the project that resulted in the discovery of the Swedish Mutation. They demonstrate that an open line of communication existed between Hardy and Mullan, and that, at the very least, Mullan used GT12 data created at the behest of Hardy to perform linkage calculations that he alleged demonstrated the likelihood of a mutation in APP.

The undisputed facts are sufficient to prove that Hardy was a joint inventor. At a minimum, they show that Hardy requested, reviewed, and conveyed to Mullan the results of key experiments needed to determine the existence of a mutation, and that Mullan used the information and DNA he received from Hardy to confirm the existence of the mutation.

But there is more. Hardy testified that he concluded by visual inspection that the GT12 data generated by Houlden were sufficiently suggestive of a mutation in APP to warrant sequencing of exons 16 and 17. (A3371:2-A3381:15.) He instructed Houlden to send three specific DNA samples to Mullan for

30

sequencing in Florida—DNA from one affected individual from each family and one unaffected individual. (A3381:17-A3383:8.) The limited amount of DNA sent to Florida is further evidence that Hardy sent the DNA for sequencing and not, as AIA alleges, to be searched for non-APP mutations, which would have required a far more extensive analysis. (A3683:8-20; A3397:23-A3399:13.) Indeed, the fact that the DNA was sent for sequencing in Florida in furtherance of the scheme to deprive Imperial of its rights therein is itself strong evidence of Hardy's contemporaneous recognition of a likely mutation.

While the precise structure of the mutation was not known until Crawford sequenced the DNA, Hardy was responsible for many of the key steps and insights that resulted in the discovery of the mutation. Indeed, without those steps and insights, Crawford would not have sequenced the DNA, and the Swedish Mutation would not have been discovered.

Taken together, this trial evidence was more than sufficient to enable the jury to find that Hardy was a co-inventor.

## 2. *Amgen* Does Not Set the Standard for Determining Co-inventorship

AIA incorrectly argues that because the invention here involves "the precise structure and location of [a] nucleic acid," whether Hardy is a joint inventor must be evaluated under *Amgen Inc. v. Chugai Pharmaceutical Co.*, 927 F.2d 1200 (Fed. Cir. 1991), which allegedly requires identification of the DNA structure for

31

conception of a gene.[6] (AIA48.) *Amgen*, however, relates to **when** conception of a

DNA invention occurs, not to the type of the contribution a joint inventor must

make. *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1474 (Fed. Cir. 1997). No

rule of law requires that each co-inventor envision the structure of the ultimately

claimed chemical. To the contrary, this court has specifically stated that "[o]ne

need not alone conceive of the entire invention, for this would obviate the concept

of joint inventorship." *Fina*, 123 F.3d at 1473. There must instead be a conception

within the group of collaborating inventors. *Vanderbilt Univ. v. ICOS Corp.*, 601

F.3d 1297, 1303 (Fed. Cir. 2010). Individuals may "contribute in some significant

way to the ultimate conception" even though they "did not conceive or reduce to

practice the entire claimed invention." *Fina Oil*, 123 F.3d at 1474. Thus, in

*Falana*, this Court held that "Falana contributed to the conception of [the claimed]

genus by providing the team of which he was a part with the method of making

these [claimed] novel compounds," even though he did not participate in the

conception of the genus claimed. *Falana v. Kent State Univ.*, 669 F.3d 1349, 1359

(Fed. Cir. 2012).

---

[6] Contrary to AIA's argument, conception of a gene can occur before one
determines its DNA sequence. *See Sanofi-Aventis v. Pfizer*, *Inc.* 733 F.3d 1364,
1368-69 (Fed. Cir. 2013).

In rejecting AIA's *Amgen* argument, the district court correctly stated:

> AIA confuses contribution and conception. Its argument overlooks the fundamental difference between the two concepts. Two or more persons may work together, not necessarily in time and place, to reach the point of conception, but not all may be actively involved at the precise moment of conception. Each one of them is an inventor so long as he or she made a significant contribution to the conception. Hence, a qualifying significant contribution may precede conception.

(A7.)

AIA erroneously asserts that the district court misconstrued its *Amgen* argument and declined to consider whether Hardy "significantly contributed to the identification of the location and structure of the Swedish mutation invention." (AIA49.) Not so. The court concluded that Hardy's efforts, which preceded the discovery of the precise location and structure of the mutation, were a significant contribution that, in AIA's words (*id.*), "led to" that discovery. (A7-12.)

AIA in effect asks this Court to create a minimum standard of contribution for claims directed to DNA. To do so would contravene 35 U.S.C. § 116 and the precedent of this Court, which has repeatedly stated that the statute "sets no explicit lower limit" for the contribution needed to qualify as a joint inventor:

> Rather, a joint invention is simply the product of a collaboration between two or more persons working together to solve the problem addressed. The determination of whether a person is a joint inventor is

33

fact specific, and no bright-line standard will suffice in
every case.

*Fina Oil*, 123 F.3d at 1473 (citation omitted).

### 3.    Hardy's Testimony Was Well Corroborated

#### a.    The Corroborating Evidence Was Legally Sufficient

While Hardy's testimony must be corroborated, corroboration is evaluated
using a rule of reason analysis of "'all pertinent evidence' . . . in order to determine
whether the 'inventor's story' is credible." *Sandt Tech., Ltd. v. Resco Metal &
Plastics Corp.*, 264 F.3d 1344, 1350 (Fed. Cir. 2001) (citation omitted).  In
conducting this corroboration analysis, the fact finder "must consider corroborating
evidence in context, make necessary credibility determinations, and assign
appropriate probative weight to the evidence to determine whether clear and
convincing evidence supports a claim of co-inventorship." *Ethicon*, 135 F.3d at
1464.

"There is no particular formula that an inventor must follow in providing
corroboration of his testimony of conception." *Singh v. Brake*, 317 F.3d 1334,
1341 (Fed. Cir. 2003).  Corroboration can be in the form of (1) contemporaneous
documentary or physical evidence, (2) circumstantial evidence about the inventive
process, or (3) testimony by someone other than the alleged inventor.  *Sandt*, 264
F.3d at 1350-51.

This Court has characterized contemporaneous documentary and physical evidence as "the most reliable proof that the inventor's testimony has been corroborated" because "the risk of litigation-inspired fabrication or exaggeration [was] eliminated." *Sandt*, 264 F.3d at 1350-51. Houlden's laboratory records satisfy this requirement. The post-invention letters upon which AIA relies (AIA58) do not. Substantial evidence demonstrated that these letters (A453-54; A457-64) were designed to mislead Imperial by inaccurately describing the research leading to the Swedish Mutation. (A3390:5-A3397:13; A3692:1-A3695:1; A1990:7-A1991:4; A3029:13-19; A3031:23-A3033:5.) Consequently, the letters are not entitled to "most reliable proof" status, and the jury was entitled to disregard them.

Moreover, circumstantial evidence alone can satisfy the corroboration rule. *Cooper v. Goldfarb*, 154 F.3d 1321, 1330 (Fed. Cir. 1998). Circumstantial evidence can corroborate because "it is consistent" with the inventor's testimony, *id.*, or because it shows a routine procedure followed by the inventor. *Berges v. Gottstein*, 618 F.2d 771 (CCPA 1980).

The jury's credibility determination is also pertinent to the evaluation of corroborating evidence. *See Ethicon*, 135 F.3d at 1464 (involving conflicting testimony from the named inventor and another individual claiming that he was a co-inventor). Here, as in *Ethicon*, the jury was free to conclude that Mullan's

testimony was not credible, and to find credible the testimony of Hardy, Goate, Houlden, Duff, and others.

Finally, as this Court made clear in *Price v. Symsek*, 988 F.2d 1187, 1196 (Fed. Cir. 1993):

> [*A*]*ll* of the evidence put forth by Price, including any of his *corroborated* testimony, must be considered as a whole, not individually, in determining whether Price conceived the invention of the count before Symsek. In other words, an inventor can conceivably prove prior conception by clear and convincing evidence although no one piece of evidence in and of itself establishes the prior conception. It is sufficient if the picture painted by all of the evidence taken collectively gives the board "an abiding conviction" that Price's assertion of prior conception is "highly probable."

(Emphasis in original.) By focusing on a single issue—whether Hardy specifically told Mullan to sequence the DNA—AIA's argument runs afoul of this basic precept.

> **b.** **Contemporaneous Documents and Testimony of Others Provide Substantial Evidence Corroborating Hardy's Testimony**

Analysis of all the evidence under the rule of reason demonstrates that the record contains sufficient evidence from which a jury reasonably could have concluded (1) that Hardy's testimony concerning his analysis of the GT12 data and why he sent the DNA and data to Mullan was adequately corroborated, (2) that he

made a significant contribution to the discovery of the Swedish Mutation, and (3) that he was, therefore, a joint inventor.

AIA incorrectly asserts that Hardy's testimony that he recognized a likely mutation in the Swedish families from visual inspection of the GT12 data is not corroborated. (AIA55.) Houlden, for example, testified that Hardy "thought family 144 was likely linked to APP, and [in family] 139 we could not determine whether it was either linked or not." (A3681:13-18; *see also* A3772:6-19.) He further testified that Hardy instructed him to send samples of Swedish DNA to Florida for sequencing. (A3683:5-20; A3684:8-10.) He knew that both Mullan and Hardy wanted to have new mutations discovered in Florida rather than in London. (A3694:21-23; A3762:5-6.) Duff also provided corroboration, testifying that Mullan told her that he and Hardy knew that the Swedish DNA had a mutation, but decided to determine the sequence of the mutation in Florida. (A3868:16-A3869:11; A3886:2-19.) Even Mullan corroborated Hardy's testimony when he conceded that the data for family 144 "looked pretty good by eye," as Hardy testified. (A2752:11-13.)

There is also substantial circumstantial evidence supporting Hardy's testimony. First, as noted above, Hardy's letters to Athena describe the procedures used to search for APP mutations that are consistent with Hardy's testimony about decisions he made concerning the Swedish DNA. Specifically, in the letters,

37

Hardy explained that the strategy involved "assess[ing] whether affected individuals share a single copy of the APP gene [using the GT12 marker]." (A241.) If the affected individuals in a family share a single copy of APP, then "exons 16 and 17 [will be] sequenced." (*Id.*)

There is no dispute that all affected individuals in both families 139 and 144 had allele 13. That fact is apparent from a visual analysis of the GT12 data, and Hardy, Mullan, and Crawford agreed. (A3372:9-A3381:15; A2735:1-3; A1884:25-A1885:8.) Thus, under the procedure Hardy outlined, exons 16 and 17 of APP would have been sequenced in these two families. Because the procedure described in the Athena letter is consistent with Hardy's testimony, this evidence corroborates his testimony. *Knorr v. Pearson*, 671 F.2d 1368, 1374 (CCPA 1982); *Cooper*, 154 F.3d at 1330.

Finally, the GT12 data sent to Mullan corroborates Hardy's testimony. As Mullan acknowledged, he could only use that data to determine the likelihood of a mutation in the APP gene. (A2717:24-2719:25.) There was no reason for Hardy to send the GT12 data to Mullan if he believed that a mutation did not exist in the APP gene and wanted Mullan to search for a mutation in another location.

### 4. The Jury Was Entitled to Reject AIA's Contentions As Not Credible

AIA implies that Mullan acted independently of Hardy, suggesting, based solely on Crawford's testimony, that Hardy and Mullan rarely communicated in

the relevant time period. (AIA54.) This is a remarkable assertion in view of Mullan's testimony that he spoke to Hardy frequently (A2730:7-17), that he spoke to Hardy about the Swedish pedigrees and the GT12 data (A2514:21-A2515:3), and that he had another conversation with Hardy discussing Mullan's linkage calculations (A2551:20-25).

AIA contends that Hardy did not communicate to Mullan his view of a likely mutation in the Swedish DNA. But the record contained substantial evidence from which the jury could have concluded that Hardy informed Mullan that a mutation was likely. Mullan conceded that he and Hardy communicated frequently during this time period and that they discussed the GT12 results. (A2730:7-17; A2514:21-A2515:3.) Moreover, Houlden testified about a conversation where Hardy stated he believed a mutation was likely. (A3772:12-19.) In light of this testimony and the decision not to sequence at Imperial, it strains credulity to suggest that Mullan was not aware of Hardy's views. If no mutation were suspected, there was no reason to send selected samples of the DNA to Florida to do the sequencing.

Mullan testified that he recalled Hardy stating that the GT12 data indicated that no mutation existed in the APP gene of these families. (A2514:21-A2515:5.) The jury was free to disregard that portion of Mullan's testimony as incredible, because it was flatly contradicted by testimony of Hardy, Goate, Duff, and

Houlden, as well as by the documentary evidence. Moreover, during cross examination, it was shown that Mullan's testimony at trial differed significantly from testimony he had given previously. (*See*, *e.g.*, A2725:4-A2726:5; A2748:23-A2750:8; A3062:1-25.)

In any event, even if Hardy had not expressly told Mullan to sequence, as Mullan claimed, the established protocol used in Hardy's laboratory mandated sequencing when all "affected individuals shared a single copy of the APP gene." (A241.) That was the case for both families 139 and 144. (A3372:9-A3381:15; A2735:1-3; A3372:13-18; A3377:1-10.) Consequently, under that protocol, Mullan would have known that exons 16 and 17 of APP in the Swedish DNA should be sequenced. While AIA claims that these protocols were superseded by the USF grant application (AIA60), the grant application did not change the protocol for screening for APP mutations or the decision point for sequencing, as explained in Section III.E above.

AIA also asserts that Hardy's letters to Imperial support Mullan's version of the facts. (AIA58.) The trial evidence demonstrated, however, that virtually all of the statements in the letters were inaccurate. (A1990:7-A1991:4; A3029:13-19; A3031:23-A3033:2; A3390:12-A3393:18; A3397:5-13; A3693:8-A3695:1.) And Hardy testified that he wrote the letters in order to mislead Imperial about the role he and Houlden played in the discovery of the mutation. (A3389:18-22; A3394:3-

14.)  The existence of this scheme is highly relevant to the credibility of these letters.  The jury, therefore, was entitled to disregard them.

AIA's rendition of the facts is inconsistent with other documentary evidence.  For example, Mullan asserted at trial that his decision to sequence was based on the LOD score and simulation analysis he conducted on family 139.  (A2520:24-A2521:11; A2524:18-A2525:1; A2533:5-A2534:23; A2540:1-13.)  Abandoning that contention on appeal, AIA now contends that Mullan's sequencing decision was based on analysis of *both* F139 and F144.  (AIA17-18.)  Both contentions are belied by Mullan's contemporaneous writings reporting that the decision to sequence was based upon analysis of family 144—the family for which Mullan agreed with Hardy's testimony that the GT12 data "looked pretty good, by eye."  (A2752:11-13.)

Specifically, in the '169 patent, Mullan stated:

> "We tested *F144* for linkage between AD and GT12 (FIG. 1a).  A lod value of 2.34 with no recombination was obtained between GT12 and AD.  Linkage analysis of 1000 simulated pedigrees . . . showed that this value was likely to occur less than one time in 100 if the marker and the disease were unlinked.  *We therefore sequenced exons 16 and 17* of the APP gene as these encode β-amyloid protein."

(A109.)  Mullan acknowledged that the patent application that matured into the patents in suit did not include any GT12 linkage analysis of family 139.  (A2736:8-11.)

In *Nature Genetics*, Mullan stated: "because of the weak evidence of linkage for F139, we concentrated on the assessment of the linkage results in ***F144***." (A472.)  On cross examination, he admitted that the manuscript originally submitted to *Nature Genetics* did not include GT12 analysis for family 139. (A2735:8-A2736:7; *see also* A6214.)

In his thesis, Mullan wrote that the "[LOD score] for ***F144*** was highly suggestive of linkage but that for F139 was not."  (A577.)  He further wrote that "the ***results in F144 were quite robust*** and suggestive of linkage. . . .  Exons 17 and 16 of the βAPP gene were therefore sequenced."  (A578.)

Similarly, no evidence other than Mullan's testimony supports AIA's claim (AIA18-19) that the decision to sequence APP was based in part on his discovery of an error in the diagnosis of one individual.  Indeed, Mullan's suggestion that there was an additional affected individual, first noted in the draft manuscript of the *Nature Genetics* paper after the mutation was discovered, was repudiated by Lannfelt.  When he reviewed that manuscript, Lannfelt, who had diagnosed the members of the families, wrote that the manuscript included one too many affected individuals.  (A6202; A2887:6-A2889:4.)  The documentary evidence thus contradicts Mullan's testimony.  Moreover, Mullan testified that he did not know if he had learned about the alleged changed diagnosis at the time he made the

42

decision to sequence and that he did not know whether the purported change in diagnosis influenced his decision to sequence. (A2726:20-A2727:16.)

In light of these and other inconsistencies, the jury was clearly entitled to find Mullan's testimony not credible. Indeed, counsel for AIA told the jury in closing argument that the inventorship issue "comes down to a credibility battle between Dr. Mullan and Dr. Hardy" and that if the jury believed Hardy, it should find that he was a co-inventor. (A4319:16-A4320:1.) AIA is now asking the Court to substitute its credibility determination for that of the jury, a clearly inappropriate request. *Marra*, 497 F.3d at 300.

### C. The Trial Court's Jury Instructions Do Not Warrant a New Trial on the Issue of Inventorship

There was no error in the jury instructions on the legal standard for joint inventorship. Taken as a whole and viewed in light of the evidence, the charge fairly and adequately submitted the inventorship issue to the jury.

AIA contends that the trial court should have instructed the jury that the inventor must "be able to define the invention by identifying the precise location and nature of the mutation." (AIA61-62.) But, as discussed above, that is not a requirement for joint inventorship. AIA also contends that the trial court failed "to define conception under this Court's clear law." (AIA62.) Contrary to AIA's assertion, the trial court indeed provided the jury with a definition of conception in its instructions. (A4409:6-22.) In fact, AIA's proposed instruction would have

endorsed the notion that each co-inventor must have an independent mental picture of the complete compound claimed. This Court has rejected that interpretation as "clearly wrong," *Vanderbilt*, 601 F.3d at 1307-08, and the trial court therefore properly rejected AIA's proposed instruction.

But even if the trial court's refusal to adopt AIA's proposed instruction was erroneous, it was harmless. The only harm alleged by AIA is that the "jury's verdict would likely have been different if it understood that Hardy's pre-discovery involvement in formulating a research plan or his role as nominal head of the St. Mary's group are not a significant contribution to the conception of a nucleic acid invention" to establish joint inventorship. (AIA62.) But the evidence demonstrated that Hardy was more than a "nominal" head of his laboratory, and his contribution to the conception involved specific actions and insights concerning the Swedish families, not merely formulating a research plan. (*See* Sections III.F and V.B.1, above.) In fact, Avid and Penn asserted that Hardy's research plans corroborated his testimony, not that those plans alone qualified him as a co-inventor. Moreover, the trial court specifically instructed the jury that a mere research plan is not enough for conception: "[a]n idea is definite and permanent when the inventor has a specific settled idea, a particular solution to the problem at hand, ***not just a general goal or research plan he hopes to pursue***." (A4409:9-12.)

44

Because the trial court's jury instructions fairly and adequately submitted the issues in the case to the jury and was not capable of confusing and misleading the jury, no new trial is warranted.

### D.    Mullan's Rights in the Patents in Suit Were Owned by USF

AIA does not challenge the sufficiency of the evidence relied upon by the jury to find that USF did not waive its rights in the Swedish Mutation invention. Moreover, AIA does not contest that the Florida Regulation was duly promulgated pursuant to authority delegated by the Florida Legislature and expressly conveys title in inventions made by USF employees to USF.[7]

Instead, AIA's appeal with respect to the issue of ownership is based solely on the legal issue of the applicability of the Florida Regulation underlying USF's ownership of the invention.  As explained below, AIA's attack on the applicability of that regulation is unfounded.

---

[7] The trial court held that pursuant to the Florida Regulation, Mullan's rights in the Swedish Mutation were owned by USF by operation of law, as the regulation unambiguously states that an invention made by a USF employee within the field or discipline in which the employee is employed by the University or by using University support "is the property of the University."  Fla. Admin. Code § 6C4-10.012(3)(c) (Jan. 8, 1992) (A325).  That holding was clearly correct in view of this Court's holding in *FilmTec Corp. v. Hydranautics*, 982 F.2d 1546, 1553 (Fed. Cir. 1992).

### 1. The Florida Regulation Was Binding by Virtue of Mullan's Employment

AIA argues that the Florida Regulation did not apply to Mullan because he had not signed an agreement recognizing its terms and did not "agree[] to be bound" thereby. (AIA63-65.) AIA's assertion that the employee must agree to be bound by the regulation as a precondition to its applicability is entirely unsupported. Mullan's employment with USF began in December 1991, and he was being paid for his work starting at that time. (A6091; A6095; A2713:15-17.) As a USF employee, Mullan was bound by all regulations set forth in Chapter 6C4-10 of the Florida Administrative Code, entitled "Personnel Matters." *See* Fla. Admin. Code § 6C4-10.001 (Rev. 1/92) (Chapter 6C4-10 contains "those personnel rules which have university-wide application by virtue of the authority granted to the University in Chapter 240, Florida Statutes."). (A6308.) The Florida Regulation is contained in Chapter 6C4-10.

While subsection (4) of the Florida Regulation states that USF and the employee shall sign an agreement "individually recognizing the terms of the rule," the regulation nowhere states that it does not take effect until the employee signs such an agreement. Indeed, the USF policy statement upon which AIA relies (AIA64-65) states that the regulation is binding as a condition of employment. (A168.) Accordingly, the regulation was effective with respect to Mullan as of December 16, 1991, the date he began his employment with USF.

46

Moreover, like any other statute or administrative regulation, as a matter of law the regulation governs the employer-employee relationship without regard to the employee's agreement thereto. *See Wilder v. GL Bus Lines*, No. 99 Civ. 9992, 2000 WL 959751, at *9 (S.D.N.Y. July 11, 2000), *affirmed as to dismissal of plaintiff's claim but vacated in part as to award of costs*, 258 F.3d 126 (2d Cir. 2001) (rejecting employee's assertion that he could not be relieved of his duties following a positive drug test, pursuant to a Department of Transportation regulation, where employer had failed to comply with companion regulation requiring employer to "ensure that each driver . . . sign a statement certifying that he or she ha[d] received a copy of these [drug policy] materials") (quotation from companion regulation 49 C.F.R. § 382.601(d)). Simply put, the employee does not have the power to veto the regulation by delaying or refusing to sign an acknowledgement. The language contemplating recognition of the terms of the regulation is thus merely a formality and not a condition for its applicability. *See FilmTec v. Hydranautics*, 982 F.2d at 1553 (though formalities of the statute were not complied with, "that omission does not change the effect of the law.").

This is particularly true here, where Mullan and Hardy were provided with complete information about the USF regulations before they began working at the university. Specifically, at his initial meeting with Hardy and Mullan in the fall of 1991, Newkome informed them of USF's regulations and policies regarding

47

ownership of inventions and provided them with copies of those regulations. (A2758:11-A2762:17; A2763:25-A2764:3; A2775:24-A2776:5.) Indeed, the very reason Sexton, Mullan, and Hardy sought to obtain Newkome's signature on the letter AIA claims waived USF's rights in the Swedish Mutation invention is because they knew that the invention would otherwise be owned by USF pursuant to the regulation, by virtue of Mullan's employment by USF. (A3400:16-A3402:1; A3403:4-A3404:11.) They knew that USF would own the invention even though Mullan had not yet signed a statement "recognizing the terms" of USF's regulations. Moreover, *all* of Mullan's employment agreements, including the one governing the period of time during which the invention was made, confirm that the contracts are "subject to . . . the rules and regulations of the Board of Regents and the University." (A896-903.)

### 2. The Florida Regulation Is Not Subject to 35 U.S.C. § 261

By insisting that a written agreement "recognizing the terms of the Regulation" is necessary (AIA63-65), AIA erroneously mischaracterizes the effect of the Florida regulation as an "assignment" that is subject to 35 U.S.C. § 261. But the trial court correctly held that an ownership interest in an invention and any patent thereon may pass from the inventor to another by operation of law. (A58; A60-61.) That holding was proper in view of the numerous holdings of this Court that Section 261 is not the sole means by which ownership interests in patents may

48

be conveyed. *See Sky Techs. LLC v. SAP AG*, 576 F.3d 1374, 1380 (Fed. Cir. 2009) (holding that state foreclosure law may convey ownership of patents, noting "assignment is not the only method by which to transfer patent ownership.") (citation omitted); *Akazawa v. Link New Tech. Int'l, Inc.*, 520 F.3d 1354, 1356 (Fed. Cir. 2008) (expressly recognizing methods of conveying ownership other than by assignment, such as through state or foreign intestacy law, holding "there is nothing that limits assignment as the only means for transferring patent ownership. ***Indeed, the case law illustrates that ownership of a patent may be changed by operation of law***."); *see also Enovsys LLC v. Nextel Commc'ns, Inc.*, 614 F.3d 1333, 1342-43 (Fed. Cir. 2010) (holding that inventor's wife had ownership interest in patent applications filed while inventor lived in a community property state, and subsequent divorce decree acted to divest wife of her ownership interest in patents); *Isr. Bio-Engineering Project v. Amgen Inc.*, 401 F.3d 1299, 1304-05 (Fed. Cir. 2005) ("Under Israeli law, the discoveries of an employee are the property of his or her employer.").

The Florida Regulation is not an assignment. Rather, it acts to allocate ownership of rights by operation of law. As such, it is not subject to 35 U.S.C. § 261, and no written agreement to be bound by the regulation is necessary. AIA's argument to the contrary should be rejected.

49

### 3.    The Florida Regulation Is Not Preempted

AIA argues that the Florida Regulation is preempted in view of Supreme

Court dicta in *Board of Trustees of the Leland Stanford Junior University v. Roche*

*Molecular Systems, Inc.*, 131 S. Ct. 2188 (2011).  AIA concedes, however, that

*Stanford* does not address the issue of preemption.  Instead, *Stanford* addressed the

issue of whether the specific language of the Bayh-Dole Act would automatically

vest ownership of certain federally-funded inventions in federal contractors.  The

Supreme Court held that the Bayh-Dole Act does not automatically vest ownership

of such inventions in federal contractors because it does not contain unambiguous

language doing so.  The Court did not, however, hold that ownership of inventions

necessarily belongs to inventors in all circumstances, and indeed noted several

instances in which, by operation of law, ownership could vest in another.  *Id.* at

2195.

The language of the Florida Regulation, by contrast, is different from that of

the Bayh-Dole Act, and ***does*** unambiguously vest ownership of USF's employees'

inventions in USF.   Therefore, the Florida Regulation, which governs ownership

of inventions made by USF employees, does not conflict with the Supreme Court's

*Stanford* decision or federal law, and is not preempted.

Indeed, this Court has repeatedly confirmed that ***ownership*** of patent rights

is governed by state law, not federal law.  *See Enovsys*, 614 F.3d at 1342 ("Who

has legal title to a patent is a question of state law"); *Sky Techs.*, 576 F.3d at 1379

("patent ownership is determined by state, not federal law"); *Akazawa*, 520 F.3d at

1357 ("Our case law is clear that state law, not federal law, typically governs

patent ownership."); *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567,

1572 (Fed. Cir. 1997) ("the question of who owns the patent rights and on what

terms typically is a question exclusively for state courts").  Relying on *Jim Arnold*,

a district court evaluating the same Israeli ownership statute that was at issue in

*Israel Bio-Engineering Project* recently noted:

> Nor is there any indication that federal courts have
> imposed a uniform patent ownership scheme as urged by
> defendant.  In fact, courts typically turn to state law to
> determine who owns the patent rights and on what terms,
> despite the obvious lack of uniformity that will result
> from such an analysis.  Because states have the authority
> to govern the ownership of inventions and patents along
> with other types of property, federal courts look to the
> law of the underlying jurisdiction when determining
> ownership.

*Krausz Indus. Ltd. v. Romac Indus., Inc.*, No. C10–1204RSL, 2011 WL 3563419,

at *3-4 (W.D. Wash. Aug. 15, 2011) (citations omitted)).

Because ownership of inventions and patents is typically governed by state

law, AIA is incorrect in arguing that rights in an invention may pass at conception

only by (1) a law enacted by Congress or (2) by contractual agreement between the

inventor and an assignee.  (AIA67.)  The fallacy in AIA's argument is

demonstrated by this Court's holding in *Enovsys*, where the Court acknowledged

51

that under California law, all property acquired by a person during marriage is presumed to be community property. *Enovsys*, 614 F.3d at 1342. There, the inventions had been conceived and the patent applications had been filed while the inventor was married, and the Court held that the inventor's wife had a presumptive ownership interest in the ensuing patents.[8] *Id.* *Enovsys* thus demonstrates that ownership rights may pass by operation of state law, where no written agreement pertaining to patents existed. *See also Sky Techs.*, 576 F.3d at 1381 (rejecting argument that state law allowing transfer of patent ownership without a writing was preempted, stating, "there exists no federal statute requiring a writing for all conveyances of patent ownership. Therefore, no federal law preempts the use of the Massachusetts UCC foreclosure provisions to transfer patent ownership by operation of law.").

AIA attempts to distinguish *Sky Technologies* and *Akazawa* by characterizing them as addressing **transfer** of rights, while characterizing the Florida Regulation as involving **initial vesting** of rights. But the fine distinction AIA seeks to create is without significance. The Florida Regulation acts, by operation of law, to convey ownership of inventions to USF. It matters not

---

[8] The Court subsequently held that the California court's divorce decree based upon the spouses' representation that they had no community property acted to divest the wife of her ownership interest in the patents. *Id.* at 1343.

whether that conveyance is viewed as "initial vesting" of rights in USF upon conception, or "transfer" of rights by operation of law from the inventor to USF just after conception occurs.  Indeed, the trial court specifically acknowledged both possible interpretations of the regulation, and found that USF owned the Swedish Mutation inventions under either approach.  (A58.)

The flaw is in the foundation of AIA's preemption argument, *i.e.*, AIA's insistence that there is a meaningful distinction between "initial vesting" of rights and "transfer" of rights.  To the extent this distinction is viewed as making a difference, the alternative construction of the Florida Regulation as effecting a "transfer" of rights from the inventor to USF presents no issue of preemption. Because a law should be construed to avoid constitutional problems, *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988), that alternative interpretation of the Florida Regulation provides a basis for affirming the trial court's judgment.

### 4.    AIA's Lack of Legal Title Deprives It of Standing

AIA argues that Avid and Penn cannot rely on USF's ownership interest in the patents in suit because USF supposedly "possesses no more than an equitable interest" in those patents.  (AIA69.)  But Avid and Penn do not rely on any equitable right of USF.  Instead, AIA lacks standing because it does not have legal title in the patents in suit.  Despite AIA's assertion that it "unambiguously holds

legal title to the Patents-in-Suit" by virtue of the grant from the PTO (AIA68), AIA does not have legal title because Mullan had no rights to assign when he purportedly assigned the invention to AIA.[9]

This Court has repeatedly held that a plaintiff's lack of legal title in a patent deprives it of standing to assert infringement of the patent. *See MHL Tek, LLC v. Nissan Motor Co.*, 655 F.3d 1266, 1278 (Fed. Cir. 2011) (affirming dismissal for lack of standing where asserted patents were deemed to have been subject to a "carve-out" in assignment to plaintiff ); *Bd. of Trustees of Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 848 (Fed. Cir. 2009), *aff'd*, 131 S. Ct. 2188 (2011) (holding plaintiff's defective title to rights of all inventors deprived it of standing to bring action for infringement). And a defendant may rely on a plaintiff's lack of legal title to challenge standing. *FilmTec v. Hydranautics*, 982 F.2d at 1550 (holding that defendant may challenge standing where legal title in the asserted patent resides in someone other than plaintiff); *FilmTec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568, 1572-73 (Fed. Cir. 1991) (holding that if contract assigned rights in invention to the inventor's employer, inventor would have no rights to assign to the plaintiff, and the plaintiff "would lack both title to

---

[9] AIA's lament that the trial court's judgment effectively declares the patents in suit "ownerless" (AIA68) is of no moment. The trial court held that Mullan's rights in the patents are owned by USF, and the jury found that those rights had not been waived. That is the only issue relevant to AIA's standing.

the . . . patent and standing to bring the present action."). Accordingly, Avid and Penn properly relied on AIA's lack of legal title in the invention and patents in suit—not on any equitable rights of USF—as the basis for their defense that AIA lacks standing to bring this lawsuit.

The cases upon which AIA relies, *Mercantile Nat'l Bank of Chicago v. Howmet Corp.*, 524 F.2d 1031 (7th Cir. 1975), and *Dorr-Oliver, Inc. v. United States*, 432 F.2d 447 (Ct. Cl. 1970), are easily distinguishable. In those cases, the plaintiffs had legal title to the asserted patents, and the defendants sought to rely on equitable rights of third parties to whom the inventors owed obligations of assignment. Here, by contrast, AIA lacks legal title to the patents in suit by operation of the Florida Regulation.

AIA next attempts to draw a distinction between title in ***inventions*** and title in ***patents***. (AIA69.) In effect, AIA argues that while USF may have legal title to the Swedish Mutation invention, AIA nevertheless has legal title to the patents claiming the invention. This Court rejected this very distinction in *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1253 (Fed. Cir. 2000). There, the defendant sought to distinguish between assignment of an "invention" and assignment of a patent on that invention, implying that an agreement addressing "inventions" did not encompass patents. As this Court stated, "*Filmtec [v. Allied-Signal]*, which linked

title to the invention and title to the ensuing patent, also disposes of that argument." *Id.*

As recognized by the Court in *Speedplay*, *FilmTec v. Allied-Signal* holds that where a contract assigned rights in an "invention" to the inventor's employer, the inventor would have no rights "in the invention or any ensuing patent" to assign to the plaintiff, and the plaintiff "would lack both title to the . . . patent and standing to bring the present action." *FilmTec v. Allied-Signal*, 939 F.2d at 1572-73. *See also Stanford v. Roche*, 583 F.3d at 842 (present assignment of future "inventions" acted to convey legal title to application for patent on invention). The same principle applies where rights in an invention are conveyed by operation of law. *See FilmTec v. Hydranautics*, 982 F.2d at 1553-54 (where statute vested title to "invention" in the Government, plaintiff lacked title to patent and had no standing to bring suit for infringement).

Moreover, the Florida Regulation expressly contemplates that legal title to the patents arising from inventions made by USF employees vests in USF. The regulation regards "patent rights" as within the scope of the term "inventions." *See* Fla. Admin. Code § 6C4-10.012(3)(e)(3) (A325) (referring to "inventions, including patent rights . . . ."). And the regulation was enacted pursuant to the authority granted by the Florida Legislature to each state university to "[p]erform

all things necessary to secure letters of patent, copyrights, and trademarks on any work products and to enforce its rights therein." Fla. Stat. § 240.229 (1991).

AIA's reliance on *Arachnid, Inc. v. Merit Industries, Inc.*, 939 F.2d 1574 (Fed. Cir. 1991), is unavailing. *Arachnid* addressed a different situation, in which the contract at issue contained an agreement to assign inventions sometime in the future, rather than, as here, a present transfer of rights. In view of the language of the contract, legal title to the inventions and the patents in *Arachnid* did not automatically vest by operation of law. *Id.* at 1580-81.

### E. The Trial Court's Jury Instructions on the Issue of Waiver Were Correct and Do Not Warrant a New Trial

The trial court did not err in instructing the jury on the issue of waiver. The court correctly stated the language of the Florida Regulation that employees must fully and completely disclose all inventions to USF's President or Vice President for Research. (A4413:7-11.) And the court also correctly instructed the jury as to each of the elements of common law waiver. (A4411:5-A4414:2.) Significantly, the trial court did not instruct the jury that actual or constructive knowledge of the right alleged to have been waived could *only* be found where disclosure was made in the manner prescribed by the regulation. Accordingly, contrary to AIA's assertion (AIA71), the trial court did not improperly tie the instruction on waiver to the Florida Regulation.

In arguing that the trial court erred in tying its instruction on waiver to May 4, 1992, the date of the letter signed by Newkome, AIA improperly argues that conduct by "USF" after that date could have demonstrated an intent to waive. But AIA's general reference to "USF" is inapposite. As an institution, USF can act only through its authorized agents. And the only individuals who had authority to waive USF's rights in inventions were the Vice President of Research—Newkome—and the USF President. *See* Fla. Admin. Code § 6C4-10.012(3)(e) (A325). Because the parties offered no evidence of waiver by the President, the sole person whose knowledge and intent is relevant to the issue of waiver is Newkome.

A finding of waiver requires demonstration of actual or constructive knowledge of the existence of the right alleged to have been waived. *See Winans v. Weber*, 979 So. 2d 269, 274 (Fla. Dist. Ct. App. 2007). The alleged waiver upon which AIA relied, and indeed the only possible waiver identified before the attempted assignment to AIA, was that purportedly granted by the May 4, 1992, letter signed by Newkome. Knowledge that Newkome may have acquired ***after*** the purported waiver is legally insufficient to demonstrate that he knew of the existence of the right at the time of the alleged waiver. Thus, the trial court correctly instructed the jury that there could be no waiver unless AIA proved that

Newkome was in possession of all of the material facts regarding the Swedish

Mutation invention prior to signing the May 4, 1992, letter.  (A4412:24-A4413:6.)

While AIA argues that conduct occurring after Newkome signed the letter

provides evidence that "USF" intended to waive its rights, conduct of persons other

than those having authority to waive is entirely irrelevant.  And the trial court's

instructions did not prevent the jury from considering Newkome's actions after

May 4, 1992, as evidence of his intent on that date.

The trial court also did not err by making specific reference to the Swedish

Mutation in its instructions.  The patents in suit claim inventions pertaining to the

Swedish Mutation, and the Swedish Mutation invention was the sole focus of the

trial.  Accordingly, the reference to the Swedish Mutation invention in the jury

instructions was perfectly appropriate.  Moreover, there was no evidence

supporting AIA's argument that Newkome intended any "broad waiver" of rights

in all inventions made by Mullan.[10]  Thus, even if the jury instructions had not

specifically identified the Swedish Mutation, substantial evidence supported the

jury's finding that USF did not knowingly and intentionally waive its ownership

rights in this or any invention that Mullan made while at USF.  Accordingly, even

---

[10] Indeed, Newkome had authority to waive USF's rights only as to specific inventions, and he did not have the authority to grant a broad, prospective waiver of rights to then-undiscovered inventions.  (*See* Fla. Admin. Code § 6C4-10.012(3)(e)(2)-(3) (A325); A4125:22-A4126:9; A2780:15-18.)

if the specific reference in the jury instructions to the "Swedish Mutation" was erroneous, the jury would have reached the same result in the absence of such specific reference. Any error was thus harmless and does not warrant a new trial.

### F. The Trial Court's Evidentiary Rulings Were Correct and Do Not Warrant a New Trial

AIA contends that the trial court abused its discretion by excluding various documents purportedly relevant to USF's conduct after May 4, 1992, thereby warranting a new trial. (AIA72-75.) As with its argument regarding the jury instruction, AIA asserts that those documents evince the knowledge and intent of "USF" to waive rights in the Swedish Mutation inventions. But again, the only person whose knowledge and intent is relevant is Newkome.

The documents AIA contends were wrongly excluded were not written, authorized, or contemporaneously reviewed by Newkome. Accordingly, those documents have no bearing on the issue of whether Newkome knowingly and intentionally waived USF's rights in the Swedish Mutation. The trial court thus properly excluded those documents, and their exclusion does not provide the basis for a new trial.[11]

---

[11] AIA contends that these documents could have constituted evidence of a "later waiver" by USF. (AIA73-74.) But each of the events that AIA claims effected a "later waiver" occurred after Mullan's July 15, 1992, purported assignment to AIA. Any transfer of rights back to Mullan subsequent to the date of that assignment could not retroactively cure his fatally defective assignment to AIA.

(continued…)

Specifically, the trial court properly excluded the August 13, 1992, "USF Health Sciences" newsletter (A474-475). That newsletter was not written by Newkome, he is not quoted therein, and there was no evidence that Newkome had even seen the article before his 2011 deposition.

The trial court also properly excluded the 1993 and 1995 letters written by Dr. Anthony Reading (A847; A852). The court noted that it was undisputed that Reading had no authority to waive USF's rights in inventions. (A37.) And there is no evidence that Newkome drafted, reviewed, or discussed the letters before they were signed by Reading.

Finally, the trial court did not abuse its discretion in excluding the 2000 *Nature* article purportedly quoting Kenneth Preston (A878). Aside from the double-hearsay problem with the quote attributed to Preston, he too lacked the authority to waive USF's rights in inventions. (A2382:23-A2383:1.) Finding no applicable exception, the trial court properly excluded the article as hearsay. (A39.)

-------------------

(…continued)
*See Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1365-66 (Fed. Cir. 2010) (where assignor lacked legal title at the time it attempted to assign patents to plaintiff, subsequent acquisition of title by assignor, even if given retroactive effect, did not automatically assign patents to plaintiff).

## VI.    CONCLUSION

For the reasons set forth above, the judgment of the trial court should be affirmed.

January 24, 2014                    Respectfully submitted,


*/s/ Joseph Lucci*                 */s/ L. Scott Burwell*
Joseph Lucci                       Charles E. Lipsey
Jordan J. Oliver                   L. Scott Burwell
BAKER & HOSTETLER, LLP             FINNEGAN, HENDERSON, FARABOW,
Cira Center, 12th Floor              GARRETT & DUNNER, LLP
2929 Arch Street                   11955 Freedom Drive
Philadelphia, Pennsylvania 19104   Reston, Virginia  20190
(215) 568-3100                     (571) 203-2700
jlucci@bakerlaw.com                charles.lipsey@finnegan.com
jjoliver@bakerlaw.com              scott.burwell@finnegan.com


*Attorneys for Defendant-Appellee*  Robert D. Bajefsky
Trustees of the University of      Laura P. Masurovsky
Pennsylvania                       Danielle A. Duszczyszyn
                                   FINNEGAN, HENDERSON, FARABOW,
                                     GARRETT & DUNNER, LLP
*/s/ Jerry Stouck*                 901 New York Avenue, N.W.
Jerry Stouck                       Washington, D.C.  20001
GREENBERG TRAURIG LLP              (202) 408-4000
2101 L Street, NW, Suite 1000      robert.bajefsky@finnegan.com
Washington, DC 20037               laura.masurovsky@finnegan.com
(202) 331-3100                     danielle.dusczyszyn@finnegan.com
stouckj@gtlaw.com

                                   Steven P. Caltrider
*Attorneys for Defendant-Appellee*  Manisha A. Desai
University of South Florida        Eli Lilly and Company
Board of Trustees                  Lilly Corporate Center
                                   Indianapolis, Indiana 46285
                                   (317) 276-2000
                                   caltrider_steven_p@lilly.com
                                   desai_manisha_a@lilly.com

                                   *Attorneys for Defendant-Appellee*
                                   Avid Radiopharmaceuticals

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that copies of the foregoing BRIEF OF APPELLEES AVID

RADIOPHARMACEUTICALS, THE TRUSTEES OF THE UNIVERSITY OF

PENNSYLVANIA, AND UNIVERSITY OF SOUTH FLORIDA BOARD OF

TRUSTEES were served upon registered counsel by operation of the Court's

CM/ECF system on this 24th day of January, 2014.

*Counsel for Alzheimer's Institute of America, Inc.*
K. Lee Marshall
Berrie Goldman
BRYAN CAVE LLP
560 Mission Street, Suite 2500
San Francisco, California 94105-2126
klmarshall@bryancave.com
berrie.goldman@bryancave.com

J. Bennett Clark
Ameer Gado
BRYAN CAVE LLP
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, Missouri 63102-2750
ben.clark@bryancave.com
ameer.gado@bryancave.com

/s/ *L. Scott Burwell*
L. Scott Burwell
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
11955 Freedom Drive
Reston, Virginia 20190
(571) 203-2700
scott.burwell@finnegan.com

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that the foregoing BRIEF OF APPELLEES AVID

RADIOPHARMACEUTICALS, THE TRUSTEES OF THE UNIVERSITY OF

PENNSYLVANIA, AND UNIVERSITY OF SOUTH FLORIDA BOARD OF

TRUSTEES contains 13838 words as measured by the word processing software

used to prepare this brief.

/s/ *L. Scott Burwell*
L. Scott Burwell
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
11955 Freedom Drive
Reston, Virginia 20190
Telephone: (571) 203-2700